MAYER BROWN LLP
ELIZABETH MANN (SBN 106524)
emann@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

LISA M. FERRI (*pro hac vice*)
lferri@mayerbrown.com
BRIAN W. NOLAN (*pro hac vice*)
bnolan@mayerbrown.com
RICHARD J. McCORMICK (*pro hac vice*)
rmccormick@mayerbrown.com
SCOTT A. McMURRY (*pro hac vice*)
smcmurry@mayerbrown.com
1221 Avenue of Americas
New York, NY 10020
Telephone:  (212) 506-2500
Facsimile:   (212) 262 1910

Attorneys for Plaintiff and Counterclaim
Defendant GENZYME CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| GENZYME CORPORATION,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>GENENTECH, INC., and CITY OF HOPE,<br><br>　　　　　Defendants.<br><br>GENENTECH, INC., and CITY OF HOPE,<br><br>　　　　　Counterclaim Plaintiffs,<br><br>vs.<br><br>GENZYME CORPORATION,<br><br>　　　　　Counterclaim Defendants. | Case No. 2:15-cv-09991-GW-AGR<br><br>**PLAINTIFF GENZYME CORP.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF CONCERNING U.S. PATENT NO. 7,923,221**<br><br>Ctrm:  10, Spring Street<br>Judge: Hon. George H. Wu |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   DEFENDANTS CLEARLY AND UNMISTAKABLY DISAVOWED CLAIM SCOPE COVERING ALTERED VARIABLE REGIONS ............................................................... 2

    A.    Defendants' Prosecution Arguments Are Not "Subject To More Than One Reasonable Interpretation" .................................... 2

    B.    Defendants' Boilerplate Language in Response to the Examiner's Rejections Does Not Rescue the Claims From Disclaimer ....................................................................... 6

    C.    Purported Disclosures in the Cabilly III Specification of Altered Variable Regions Do Not Rescue the Claims From Disavowal ......... 8

    D.    After Defendants Cancelled Claims 55 and 56 and Amended Claim 53 in Response to Enablement Rejections, They Did Not Inform the Examiner That the Surrendered Scope of the Claims Needed to Be Revisited ....................................................... 10

III.  GENZYME'S PROPOSED CONSTRUCTIONS OF "VARIABLE REGION" ARE CLEAR, AND THEY ARE CONSISTENT WITH JUDGE PFAELZER'S PRIOR CONSTRUCTION OF THE CABILLY II PATENT IN THE MEDIMMUNE LITIGATION ............... 13

IV.  CONCLUSION .......................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astrazeneca AB v. Mutual Pharm. Co., Inc.*,
  384 F.3d 1333 (Fed. Cir. 2004) ........................................................................ 4, 5

*Bai v. L & L Wings, Inc.*,
  160 F. 3d 1350 (Fed. Cir. 1998) ........................................................................ 6

*Biogen Idec, Inc. v. Glaxosmithkline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ........................................................................ 4

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F. 3d 973 (Fed. Cir. 1999) ........................................................................ 4

*Exhibit Supply Co. v. Ace Patents Corp.*,
  315 U.S. 126 ........................................................................................................ 6, 7

*Hakim v. Cannon Avent Grp., PLC*,
  479 F.3d 1313 (Fed. Cir. 2007) ........................................................................ 11

*Hubbell v. United States*,
  179 U.S. 77 (1900) ............................................................................................ 7

*MarcTec, LLC v. Johnson & Johnson, Inc.*,
  394 F. App'x 685 (Fed. Cir. 2010) .................................................................... 11

*MedImmune, Inc. v. Genentech, Inc.*,
  2007 WL 5760839 (C.D. Cal. Aug. 16, 2007) .............................................. 13, 14

*Omega Engineering, Inc., v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................ 5

*Reckitt Benckiser, Inc. v. Watson Labs. Inc.*,
  430 F. App'x 871 (Fed. Cir. 2011) .................................................................... 3, 6

*Regents of Univ. of Cal. v. Dakocytomation Cal.*,
  517 F. 3d 1364 (Fed. Cir. 2008) ........................................................................ 6

*SanDisk Corp. v. Memorex Prods., Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) ........................................................................ 2

ii

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
  311 U.S. 211 (1940) ............................................................................ 8

*Springs Window Fashions v. Novo Industries*,
  323 F. 3d 989 (Fed. Cir. 2003) ........................................................... 2

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
  336 F. 3d 1322 (Fed. Cir. 2003) ......................................................... 7

*United Video Properties, Inc. v. Amazon.com, Inc.*,
  561 F. App'x 914 (Fed. Cir. 2014) ............................................... 3, 10

Pursuant to the Court's Order of February 18, 2016 (D.I. 48), Plaintiff Genzyme Corporation submits this Responsive Claim Construction Brief in reply to Defendants' Opening Claim Construction Brief (D.I. 75, "Defs. Br.") and further to Genzyme's Opening Claim Construction Brief (D.I. 74, "Genzyme's Br.") concerning the asserted claims of U.S. Patent No. 7,923,221 (the "Cabilly III patent," Ex. A[1]).

## I.   Introduction

Defendants' inflated declarations of the "revolutionary," "pioneering" and "profound" nature of the Cabilly III patent (Defs. Br. at 1) are not only irrelevant to the claim construction analysis, they are as overblown as the unsupported scope of the Cabilly III claims that Defendants have asserted against Genzyme (and every other accused infringer in past lawsuits). The alleged invention of Defendants' patent does not assist in identifying disease targets for antibodies that can be used as life-saving therapies, like Genzyme's "humanized" Lemtrada® antibody product. At best, Cabilly III is no more than a <u>manufacturing</u> patent—and one that certainly cannot be read to encompass the innovation of Lemtrada®.

What matters at this stage of the case, for claim construction, is the threshold determination of how broadly the Cabilly III patent claims should be interpreted. As set out in Genzyme's Opening Claim Construction Brief, during Defendants' prosecution of the Cabilly III patent, the Patent Office rejected as non-enabled the claim language that would be necessary to encompass humanized antibodies such as Lemtrada®—and in fact the Examiner rejected the claims over the very antibody that is Lemtrada®. In response, Defendants cancelled and amended the claims to remove the exact language the Examiner objected to. In doing so, they created a

---

[1] Citations herein to Exhibits A-T refer to exhibits that are attached to the Declaration of Richard J. McCormick in Support of Plaintiff Genzyme Corp.'s Opening Claim Construction Brief (D.I. 74-1). Citations herein to Exhibits U-V refer to exhibits that are attached to the contemporaneously filed Declaration of Richard J. McCormick in Support of Plaintiff Genzyme Corp.'s Responsive Claim Construction Brief.

clear and unmistakable disclaimer of any claim scope that could possibly read on Lemtrada®.

There is nothing in Defendants' Opening Claim Construction Brief that would change the outcome. Defendants' potted (and selective) history of the prosecution of Cabilly III leaves out one side of the story: the Examiner's rejections, which <u>must</u> be considered by the Court as part of the "totality" of the prosecution history in determining disclaimer. The crucial details of the Examiner's rationale for rejecting the claims leave no doubt that Defendants deliberately elected to surrender the claim scope necessary to cover Lemtrada® in order to secure allowance of their claims. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular [product] and then change position and later sue a party who makes that same [product] for infringement." *Springs Window Fashions v. Novo Industries*, 323 F. 3d 989, 995 (Fed. Cir. 2003).

## II. Defendants Clearly And Unmistakably Disavowed Claim Scope Covering Altered Variable Regions

### A. Defendants' Prosecution Arguments Are <u>Not</u> "Subject To More Than One Reasonable Interpretation"

There is no ambiguity in the claim scope that Defendants surrendered during prosecution of the Cabilly III patent—they unmistakably disavowed antibodies with variable region alterations. Of course, as Defendants note (Defs. Br. at 8), if a patent applicant's arguments to the PTO are subject to "<u>more than one</u> reasonable interpretation, one of which is consistent with a proffered meaning," then no disclaimer can be found. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) (emphasis added). But that is decidedly not the case here.

The Examiner's multiple rejections during prosecution of the Cabilly III

patent make crystal clear the claimed subject matter that was found to be non-enabled: "altered" variable regions with amino acid sequences not found in a naturally occurring antibody, and in particular the exact kind of variable region alterations present in Lemtrada®. Genzyme's Br. at 15-17. In response to the enablement rejections, it is equally crystal clear what Defendants chose to do with that subject matter to secure allowance of their claims: they <u>cancelled</u> claims (55 and 56) reciting "altered" variable regions and amended the remaining claim (53) to <u>delete</u> the term "altered." *Id.* at 17-18. There is only <u>one</u> reasonable interpretation of what transpired during prosecution: Defendants abandoned the scope of their claims to altered antibodies and specifically to antibodies with altered variable regions. This is the same interpretation that the Federal Circuit reached without any uncertainty or fuss in *United Video Properties, Inc. v. Amazon.com, Inc.* when faced with a similar claim amendment and deletion of claim language after a written description rejection. 561 F. App'x 914, 917-918 (Fed. Cir. 2014) (discussed in Genzyme's Opening Claim Construction Brief, at 21-22); *see also Reckitt Benckiser, Inc. v. Watson Labs. Inc.*, 430 F. App'x 871, 876 (Fed. Cir. 2011) (finding disclaimer when applicant cancelled claims to avoid prior art rejection).

If there is any ambiguity on this point, it was sown by Defendants in their Opening Brief, which understandably neglects to focus the Court on the details of the PTO rejections because explaining the Examiner's rationale would be fatal to Defendants' proposed "plain and ordinary" meaning of "variable region." (Incredibly, Defendants have not provided the Court with any of the PTO Office Actions rejecting the claims. *See generally* Declaration of Adam Brausa in Support of Defendants' Opening Claim Construction Brief (D.I. 75-1).) In Defendants' one-sided, abridged version of the prosecution history, the rejections appear to be

incidental to the claim construction analysis that this Court must undertake.[2] But it is the "<u>totality</u> of the prosecution history that must be assessed, not the individual segments of the presentation made to the Patent and Trademark Office by the [patent] applicant." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F. 3d 973, 978 (Fed. Cir. 1999) (emphasis added).[3] Here, the totality of the prosecution history points in a single direction: Defendants' "clear and deliberate" response to the "particular grounds for [the Examiner's] rejection" by cancelling and amending the claims had the effect of "limiting their invention to what the Examiner believed they enabled." *See Biogen Idec, Inc. v. Glaxosmithkline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013).

Defendants nevertheless assert that "this is not a case in which an applicant said that it was adding a claim limitation or surrendering claim scope to overcome a rejection." Defs. Br. at 20. But this misstates the standard for disclaimer as if it were one that requires rigid formalism to effect a surrender; and it is otherwise an unfrank synopsis of what transpired—and of what Defendants said—during examination of Cabilly III in the PTO. To start, "clear disavowal" does not require an "'expression of manifest exclusion or restriction' in the form of 'my invention does not include ___.'" *Astrazeneca AB v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004). As discussed in Genzyme's Opening Brief, an expression of manifest exclusion tantamount to a disclaimer can be inferred on the basis of claim

---

[2] For example, Defendants have only this to say about the two PTO rejections forming the primary basis for disclaimer: "Following an office action rejecting the claims under the enablement requirement… Genentech provided an amendment and detailed argument in response" (Defs. Br. at 16-17), and "Following another rejection, Genentech amended Claim 53 and cancelled Claims 54-66…" (*id.* at 18).

[3] Insofar as Defendants suggest (Defs. Br. at 20) that the "lengthy," "rigorous" and "extended" prosecution history—with a record "hundreds of pages long"—precludes the possibility of a "clear and unmistakable disclaimer," and that the Court should take this into account when considering Genzyme's arguments, Defendants are wrong. "The correct meaning of [the disputed] term is established by reading the prosecution history…, [which] is a legal exercise [that the Court] is obligated to conduct independently." *Elkay Mfg.*, 192 F.3d at 978.

4

amendments and cancellations alone. Genzyme's Br. at 21-22.

Such an inference is warranted here, simply by virtue of Defendants' claim cancellations and amendments. Moreover, after two rounds of the same enablement rejection, and having been unable to persuade the Examiner that the claimed altered variable regions were patentable, Defendants amended and cancelled the claims with the express purpose of "mooting" the enablement rejection. Ex. P, Amendment (Jan. 8, 1998) at 6; Genzyme's Br. at 15-18. This ended the stalemate with the Examiner and permitted the remaining claims to proceed for further prosecution. It is irrelevant that Defendants did not explicitly state that they were surrendering claim scope (*see Astrazeneca AB*, 384 F.3d at 1340) because that is the exact effect of what they did by removing the unpatentable "altered variable region" subject matter from the Patent Office's consideration. It was Defendants' choice to move past the rejections by cancelling and amending the claims. And if there was any doubt left after doing so, Defendants amended the clam term "altered" to "chimeric," reinforcing the notice to the public that the claim scope going forward would be limited to unaltered variable regions. Genzyme's Br. at 18; *see also supra* at 10.

Upon full consideration of the communications from Defendants and from the Examiner in the prosecution history, this is not a case where the Court "simply cannot tell" if a disavowal occurred during prosecution of the Cabilly III patent. *See Omega Engineering, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). There is only one reasonable interpretation and conclusion that the Court can draw from the prosecution history—Defendants surrendered claim scope to altered variable regions.

**B.      Defendants' Boilerplate Language in Response to the Examiner's Rejections Does Not Rescue the Claims From Disclaimer**

Although Defendants challenged the Examiner's rejections, they ultimately elected not to dispute the matter further when they cancelled and amended the claims. Defendants may have informed the Examiner that the amendment and cancellations were "without acquiescing in the Examiner's position" (and similar language, Defs. Br. at 18-19), but that does not affect the Court's analysis or change the outcome of the disclaimer determination. Presenting boilerplate language in responding to a rejection cannot rescue the claims from the unmistakable surrender caused by Defendants' claim cancellations and amendment. Such reflexive incantations are regularly ignored by the Federal Circuit when determining whether a claim is entitled to a narrow or broad construction. *See Reckitt Benckiser, Inc.*, 430 F. App'x at 876 (finding a "clear and unambiguous" narrowing disclaimer based on claim cancellation, despite applicant's statement that the claims were cancelled "to facilitate prosecution"); *Bai v. L & L Wings, Inc.*, 160 F. 3d 1350, 1355 (Fed. Cir. 1998) ("boilerplate remark" made to examiner in connection with claim amendment does not rebut narrowing of claim scope by prosecution history estoppel for purposes of infringement under the doctrine of equivalents); *Regents of Univ. of Cal. v. Dakocytomation Cal.*, 517 F. 3d 1364, 1378 (Fed. Cir. 2008) (applicant's reasoning that "prosecution will be facilitated" by amending the claim "is clearly nonsubstantive and does not help [the Court] in [the prosecution history estoppel] analysis.").

Moreover, generic statements that Defendants "vigorously traversed" and were not "acquiescing in" the rejections are belied by the very fact that they could not traverse and did acquiesce in the rejections, as evidenced by the necessity for the claim cancellations and amendment to allow prosecution to progress. Because the final question is one of claim construction, "it is immaterial whether the examiner was right or wrong in rejecting the claim as filed." *Exhibit Supply Co. v.*

6

*Ace Patents Corp.*, 315 U.S. 126, 137. By "choos[ing] to dispute the examiner's view of matters" and yet ultimately deciding to "let stand [the] examiner's restrictive interpretation" of the claims, the public was "entitled to equate [the applicant's] acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest." *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F. 3d 1322, 1330 (Fed. Cir. 2003).

Similarly, blanket assertions that claim cancellations and amendments were made "without disclaimer" cannot override the <u>substantive and deliberate actions</u> Defendants took in actually cancelling the claims and deleting claim language. If boilerplate like this were all that was required to rescue a claim from disavowal, it would result in inconsistent findings of disclaimer throughout the Cabilly III prosecution. *Compare, e.g.*, Ex. P, Amendment (Jan. 8, 1998) at 2 (claims 55 and 56 cancelled only "without prejudice") *with* Ex. R, Amendment (Jan. 6, 1999) at 1-2 (cancelling claim 53 without comment, and cancelling claims 68-71 "without prejudice or disclaimer").

The patent attorney's rote idiom put forward by Defendants during prosecution of the Cabilly III patent should not immunize Defendants' concurrent claim cancellations and amendments from surrender, because doing so would effectively eviscerate the doctrine of prosecution history disclaimer. Patent applicants could forever preempt any future finding of disavowal with a simple generic statement during prosecution purportedly affirming the breadth of the claims, while, in the same breath, amending their claims to moot PTO rejections or avoid the prior art. Furthermore, permitting boilerplate to undo an otherwise clear and unmistakable disclaimer runs counter to Supreme Court precedent that claim cancellations and amendments during prosecution "must be <u>strictly construed</u> against the inventor and in favor of the public." *See Hubbell v. United States*, 179 U.S. 77, 84  (1900) (emphasis added); *see also Exhibit Supply Co.*, 315 U.S. at

136-37 (in making claim amendments to overcome a rejection, the applicant "recognize[s] and emphasize[s] the difference between the two phrases and proclaim[s] his abandonment of all that is embraced in that difference"); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940) ("[A] claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent.").

### C.   Purported Disclosures in the Cabilly III Specification of Altered Variable Regions Do Not Rescue the Claims From Disavowal

Defendants rely on two passages in the Cabilly III patent specification to support their proposed construction of "variable region." The first discloses so-called "altered" antibodies and "altered" variable regions. Defs. Br. at 5 (quoting Cabilly III at 7:1-7, 11-12). This is the exact disclosure that the Examiner pointed to in twice-rejecting as non-enabled pending claims 53, 55 and 56 to altered antibodies and altered variable regions. Ex. K, Office Action (Sept. 18, 1996) at 2-3; Ex. O, Office Action (Jul. 11, 1997) at 2-3; Genzyme's Br. at 16-17. And this is the same passage that Defendants relied on in attempting—but failing—to overcome the rejections. Ex. N, Amendment (Mar. 17, 1997) at 4-5. Furthermore, Defendants deleted this exact "altered" term from the claims in response to the Examiner's enablement rejection.

The second passage, disclosing "chimeric" antibodies, is not as broad as Defendants suggest. Defs. Br. at 5-6, 15 (quoting Cabilly III at 6:51-65). Even though the exemplary chimeric antibody in this passage can have "combinations of sequences mimicking the sequences in antibodies of different sources," there is still only <u>one</u> "fusion point": between "one portion" that is homologous to one species and "the remaining segment" that is homologous to another species. Ex. A, Cabilly III patent, 6:30-35. In the "typical" chimeric antibody, this fusion point is the same

as the boundary of the variable and constant regions:



*Id.*, 6:35-40. The passage also discloses chimeric antibodies where "<u>the</u> [singular] fusion point" can be at a place other than the variable/constant boundary, for example, in the variable region:

*Id.*, 6:51-60 (emphasis added).[4] In view of the Examiner's rejections of claims to

---

[4] This is in contrast to the CDR-grafted variable region of Lemtrada®, which contains at least <u>six</u> fusion points between the human and mouse sequences. Genzyme's Br. at 8.

9

altered variable regions, this "atypical" chimera would have likewise been rejected as non-enabled. *See* Ex. K, Office Action (Sept. 18, 1996), at 3-4 ("The specification fails to enable one of skill in the art how to alter antibody variable regions. Applicant has not shown that antibodies that have been altered <u>in the variable region</u> are capable of functioning as that which is being disclosed…. Owens et al. (J. Immunol. Methods, 1994) teach that the art did not recognize alterations to the variable region until three years after the [Cabilly III patent] invention was made." (emphasis added)).

In any event, the fact that the Cabilly III patent specification arguably discloses (without enabling) variable region alterations does not make Defendants' disclaimer any less clear.[5] When amending claim 53 to replace "altered" with "chimeric," the chimeric antibody disclosures in the Cabilly III patent that Defendants relied on were limited to the "typical" chimeric antibody and conspicuously <u>did not include</u> any reference to chimeric antibodies with modifications to the variable region. Genzyme's Br. at 17-18, 23-24. Defendants' conduct in prosecuting the Cabilly III patent leaves no room for doubt that by amending and cancelling the claims to altered variable regions, they put the public on notice that they intended to abandon all antibody embodiments with any kind of altered variable region.

### D.  After Defendants Cancelled Claims 55 and 56 and Amended Claim 53 in Response to Enablement Rejections, They Did Not Inform the Examiner That the Surrendered Scope of the Claims Needed to Be Revisited

Defendants suggest that because the claim language that ultimately issued as the asserted claims underwent examination and allowance independent from claims 53, 55 and 56, the scope of the issued claims remains intact and is not subject to

---

[5] In attempting to argue against disclaimer, the patent applicants in *United Video Properties* also pointed to references in the specification allegedly supporting their broad claim scope. 561 F. App'x at 918. The Federal Circuit rejected this argument.

any earlier disclaimer. Defs. Br. at 21. But filing and gaining allowance of new claims, without more, does not wipe the slate clean of prior disclaimers, and Defendants invite the Court to commit clear error by following this reasoning. "Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history <u>must be sufficiently clear</u> to inform the examiner that the previous disclaimer… may need to be revisited." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) (emphasis added); *see also MarcTec, LLC v. Johnson & Johnson, Inc.*, 394 F. App'x 685, 687 (Fed. Cir. 2010) ("When an applicant yields claim scope in order to secure allowance of a patent, the public notice aspect of the record inhibits later retrenchment to recover what was yielded.") In *Hakim*, the Federal Circuit held that new claims prosecuted in a continuation application were subject to a narrowing disclaimer made in the abandoned parent application because applicants did not make it "sufficiently clear" to the examiner that they were seeking to recapture the claim scope they had previously surrendered. *Hakim*, 479 F.3d at 1317-18.

At no time during the <u>thirteen-year</u> time period between the cancellation of claims 55 and 56 and amendment of claim 53 (in 1998) and  the issuance of the Cabilly III patent (in 2011) did Defendants bring to the Examiner's attention their intention to recover disavowed claim scope by re-claiming variable region alterations. In fact the record shows just the opposite—their continued acquiescence to similar enablement rejections.

In the Office Action immediately following Defendants' cancellation of claims 55 and 56 and amendment of claim 53, the Examiner sua sponte reconsidered his previous withdrawal of claims 67 and 68 (among others) in the interests of "compact prosecution." Ex. U, Office Action (Jul. 6, 1998) at 2. Like claims 53, 55 and 56 (before they were cancelled/amended), claims 67 and 68 were

also directed to altered antibodies and altered variable regions:[6]

> 67. A replicable expression vector comprising a DNA sequence encoding an **altered antibody heavy or light chain** or a fragment thereof having specificity for a particular desired antigen, **the amino acid sequence of which as been varied from that of a mammalian immunoglobulin heavy or light chain** or a fragment thereof **by alteration, deletion or addition of one or more predetermined amino acid residues**.

> 68. The replicable expression vector of claim 67 wherein **said alteration, deletion or addition of one or more amino acid residues is in the variable region** of an immunoglobulin heavy or light chain.

Ex. M, Preliminary Amendment (Jul. 7, 1995) at 3-4 (emphasis added). With respect to these claims, the Examiner rejected them as non-enabled, based on the earlier rejections of record of claims 53, 55 and 56. Ex. U, Office Action (Jul. 6, 1998) at 4. In response—and as they had done with claims 53, 55 and 56—Defendants cancelled claim 68 (to altered variable regions) and amended claim 67 such that the claimed "altered" antibody was no more than a typical chimeric, "having a human constant region sequence and non-human mammalian variable region sequences." Ex. R, Amendment (Jan. 6, 1999) at 1-2.

This is telling. After the disclaimer that was created by cancellation and amendment of claims 53, 55 and 56, Defendants had <u>another</u> opportunity to persuade the Examiner of the patentability of altered variable regions—or they at least had an opportunity to notify the Examiner that they wanted to revisit what they had previously disclaimed. And yet they did neither. Instead, they capitulated to the same rejection <u>for a second time</u> by cancelling claim 68 and amending claim

---

[6] In its Opening Claim Construction Brief, Genzyme incorrectly stated that variable region alterations were not the subject of prosecution after Defendants' cancellation of claims 55 and 56 and amendment of claim 53. Genzyme hereby corrects that error.

67. If any trace of ambiguity lingered regarding the scope of Defendants' disclaimer of altered variable regions, this erased it.

### III. Genzyme's Proposed Constructions of "Variable Region" Are Clear, and They Are Consistent with Judge Pfaelzer's Prior Construction of the Cabilly II Patent in the MedImmune Litigation

Genzyme does not seek to "define broader claim limitations" of the asserted claims, as Defendants state (Defs. Br. at 11). Genzyme is asking the Court to <u>narrow</u> the claims, to make it clear and unambiguous what they <u>exclude</u>. Genzyme's Br. at 19; Joint Claim Construction Statement (D.I. 70), at 2 n.1, 3 n.2. And what they exclude precisely what Judge Pfaelzer found the Cabilly II patent claims excluded when she construed them in the MedImmune litigation. (Contrary to Defendants' statements in their opening brief, Judge Pfaelzer did <u>not</u> accept Defendants' proposed construction. Defs. Br. at 1 n.1.)

Although the "similar theory" advanced by MedImmune in that case concerned a different patent (the Cabilly II patent, U.S. Patent No. 6,331,415, Ex. V), which has different claim language than the asserted Cabilly III claims, Judge Pfaelzer's interpretation of the relevant claim terms should illuminate this Court's construction. At issue in the *MedImmune* case was the meaning of the claim term "derived from" in claim 13 (dependent on claim 1), which provided a process (similar to the Cabilly III process) for making an antibody, "wherein the constant domain is derived from a species or class <u>different from</u> that from which the variable domain to which it is attached is derived." Ex. V, Cabilly II patent, claims 1, 13 (emphasis added); *MedImmune, Inc. v. Genentech, Inc.*, 2007 WL 5760839, (C.D. Cal. Aug. 16, 2007). At its core, this is the precise issue that Genzyme is requesting that the Court consider for claims 1, 2, 15 and 24 of Cabilly III: can there be any components of the variable region that come from the same species (i.e., human) as those that make up the constant region?

Judge Pfaelzer appreciated the crux of the issue, stating that "this dispute

13

addresses whether, without more, 'derived from' implies origination from a single source, origination from multiple sources, origination from sources responsible for a majority contribution, origination from sources responsible for a *de minimus* contribution, or some other formulation." *MedImmune*, 2007 WL 5760839, at *12. Judge Pfaelzer also understood that her claim construction would impact infringement, because MedImmune's Synagis® antibody product has (like Lemtrada®) a CDR-grafted variable region. *Id.* ("In practice, this dispute has implications for potential infringement. MedImmune's Synagis® product contains a variable domain originating from both a human and a murine source.") Judge Pfaelzer found that "[i]solated from the context of the claims, the plain and ordinary meaning of 'derived from' neither implies MedImmune's claimed limitation… nor authorizes Genentech's claimed expansion." *Id.* However, when considered in the full context of claim 13, "derived from" <u>would exclude from the variable region any components from the same species that is also the source of the constant region</u>: "If the Court were to construe the expanded, technical phrase from claim 13, which reads, 'derived from a species or class different from that from which the variable domain to which it is attached is derived,' the Court's construction of this longer term would be, 'originating <u>from a single source, different</u> from that which the variable domain also originates.'" *Id.* at 12 n.7 (emphasis added).

Thus there is nothing "difficult to parse" (Defs. Br. at 11) in Genzyme's proposed constructions—they align precisely with the claim scope that Judge Pfaelzer found in *MedImmune*. The source of the variable region for claims 1, 2, 15 and 24 of the Cabilly III patent must come from a single species and therefore be different than the source of the constant region (human).  This is what Genzyme's proposed construction makes clear: the variable region must be "homologous to a non-human variable region sequence."

## IV.  Conclusion

For the reasons above and in Genzyme's Opening Claim Construction Brief, the Court should respectfully adopt Genzyme's proposed constructions as set forth in the Joint Claim Construction Statement (D.I. 70).

Dated: July 1, 2016

MAYER BROWN LLP

ELIZABETH D. MANN
LISA M. FERRI
BRIAN W. NOLAN
RICHARD J. MCCORMICK
SCOTT A. MCMURRY


By:    /s/Richard McCormick
          Richard McCormick
Attorneys for GENZYME CORP.
